IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DEBRA R. W.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 19-cv-00013-DGW[2] |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff filed a prior application for disability benefits, which was denied on March 27, 2014. Plaintiff did not file an appeal. Therefore, plaintiff was conclusively not disabled before March 28, 2014 and must prove that she was disabled after that date. Plaintiff reapplied for disability benefits in April 2015 and September 2015, alleging disability as of April 1, 2014.[3] After holding an evidentiary

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) and Administrative Order No. 240. See, Docs. 8, 17.

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt.

hearing, the Administrative Law Judge (ALJ) denied the application on May 10, 2018. (Tr. 17-31). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred by failing to account for moderate deficits of concentration, persistence, or pace in the residual functional capacity (RFC) finding.

2. The ALJ did not adhere to SSR 16-3p when he failed properly assess plaintiff's subjective allegations, including her daily activities.

## Applicable Legal Standards

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

---

404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any step, other than at step 3, precludes a finding of disability. *Ibid.* The plaintiff bears the burden of proof at steps 1–4. *Ibid.* Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Ibid.*

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. The ALJ found that plaintiff had severe impairments of cervical degenerative disc disease status post fusion, lumbar degenerative disc disease status remote post fusion, bipolar disorder (BD), and borderline personality disorder (BPD).

The ALJ found that plaintiff had the RFC to perform work at the light exertional level, limited to no climbing of ladders, ropes, and scaffolds; occasional climbing of ramps and stairs; occasional stooping, crouching, crawling, and kneeling; and climbing of ramps and stairs. The ALJ found that plaintiff was also limited to performing simple routine tasks with only occasional decision-making or changes in the work setting. Additionally, plaintiff was limited to no interaction with the public and only brief and superficial interaction with coworkers. Based on the testimony of a vocational expert (VE), the ALJ concluded that plaintiff was unable to do her past relevant work, while also making an alternative finding that she was able to do other

jobs at the light exertional level which exist in significant numbers in the national economy.

## **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff, which were entirely focused on plaintiff's mental impairments.

1. **Agency Forms**

Plaintiff was born in 1972 and was almost 42 years old on the alleged onset date of April 1, 2014. (Tr. 162). Plaintiff submitted function reports in October 2015 and February 2016 in which she complained of debilitating depression, anxiety, and panic attacks. She stated that she had trouble getting along with authority figures because of her "moody & hateful personality." (Tr. 354, 427). She alleged that she had increasingly exhibited socially isolative behavior and had feelings of self-loathing. (Tr. 385). She claimed she had to be reminded to pay her bills and complete activities of daily living; such as brushing her teeth and bathing. (Tr. 422-423, 425). She also said that she could not go outside alone because, in the past, she had forgotten where she was, which caused her to panic. (Tr. 424). She further complained of only being able to pay attention for 5 minutes intervals; forgetting verbal instructions; and being unable to handle stress and change. (Tr. 426-427). She admitted preparing full meals sometimes, cleaning, doing laundry, taking care of her pets, and grocery shopping 1 to 2 times a month. (Tr. 381-383, 423-424).

### 2. Evidentiary Hearing

Plaintiff testified that she lived in an apartment with her mother, a child, and grandchild to varying degrees. (Tr. 51-55). She stated that she could not work as a janitor because she didn't "like being by myself that much." When asked about mentally being able to work as a dishwasher, she related her experience at Panera Bread where she claimed she had a nervous breakdown and was fired. (Tr. 74-75). Regarding her BD, plaintiff claimed that she had an episode of depression at least once a month, but sometimes up to twice a month. (Tr. 78). She also stated that she had a manic episode at least once a month. (Tr. 79). Plaintiff also reported that her anxiety caused her to be reclusive and limited her ability to grocery shop without company. (Tr. 79-80).

A VE also testified. The ALJ asked the VE a hypothetical question which corresponded to the RFC assessment, specifically adding a limit "to work that's simple and routine and repetitive tasks, and a work environment free of fast-paced quota requirements involving only simple work-related decisions, with few if any workplace changes, no interaction with the public, and brief and superficial interaction with coworkers." The VE testified that there would be jobs in the national economy using the hypothetical. (Tr. 92).

### 3. Medical Records

Plaintiff saw counselor Gretchen Jackson in January 2014, who assessed plaintiff with BD and BPD. Jackson noted plaintiff's mood swings, with plaintiff going from euthymic to depressed, and noted plaintiff's insight and judgment were poor. Jackson consistently observed that plaintiff had intact memory. During one

of the sessions, plaintiff reported having a great holiday and talked about spending time with her kids. She also stated that she was going before a judge regarding her disability and hoped to get disability so that she could have some sense of financial security. Throughout the sessions in January, and into February, plaintiff attributed stress to her mother and her brother, who she lived with. She stated her brother had problems with alcohol. Jackson recommended plaintiff continue therapy, practice coping skills, practice regulating her emotions, decrease argumentative communication, and increase positive feeling communication. (Tr. 573-580).

Later in February 2014, Jackson reported plaintiff's appearance was appropriate on mental status exam with intact memory and gained attention. Plaintiff claimed to have problems with her ex-husband, Big Jeff, related to visitation with their child. Plaintiff also stated that her brother was no longer living in the residence with her and her mother. Jackson again observed mood swings, noting plaintiff was possibly manic with disconnected affect, and she often laughed and smiled when discussing frustrations and stressors. (Tr. 571-572, 992).

Throughout the next few months, plaintiff's mental status examinations were mostly unchanged, with memory remaining intact and attention gained. Jackson continued to report plaintiff's mood swings. Plaintiff discussed problems living with her mother, problems with her brother coming back to stay with them, and visitation with her child. She also stated that a judge approved her disability, but later found out she was denied. (Tr. 551-570).

In September 2014, Plaintiff was seen by Dr. Sunil Gangwani, a psychiatrist, who noted plaintiff's diagnosis of BD with a long history of mood instability and

suggested a possible diagnosis of BPD. He reported plaintiff had a history of suicide attempts, one during her teen years and the other in 2009. Dr. Ganwani listed plaintiff's medications as Effexor, Vistaril, carbamazepine, and trazodone. He stated plaintiff presented with ongoing stressors regarding her children. He also mentioned that plaintiff was no longer in communication with a male friend, Dusty, who was a carny with a travelling outfit.[4] He remarked that plaintiff was cooperative and interactive; her flow of thought was logical and sequential; there was no evidence of any delusional thought processes; her affect was noted to be restricted; and her insight and judgment appeared limited to fair. (Tr. 636-637).

In 2015, Jackson's notes indicate plaintiff's mood and behavior were imbalanced, with plaintiff teetering between sad and irritable to happy and talkative. Jackson continued to report that plaintiff was alert and oriented with memory intact, although plaintiff still exhibited impaired insight and judgment. (Tr. 501-523). In July and August 2015, she claimed she had a meltdowns, leading to thoughts of suicide. She stated that she used coping skills to keep her mind busy, saying she called friends, laid down, watched movies, and played on her computer. She also planned to spend the weekend with her friends after the August incident. (Tr. 487-489, 490-491). Dr. Gangwani reported that plaintiff was alert and oriented with memory intact, and limited to fair insight and judgment. (Tr. 994).

In 2016, plaintiff's mood and behavior continued to be imbalanced. According to Jackson, plaintiff went from depressed to euthymic to manic, cycling through

---

[4] The Merriam–Webster dictionary defines "carny" as "a person who works with a carnival." http://www.merriam-webster.com/dictionary/carny (last visited on June 20, 2019).

phases in a seemingly random fashion throughout the year. She continued to report that plaintiff was alert and oriented with memory intact, although plaintiff still exhibited impaired insight and judgment. (Tr. 806-841). She coped with stress by staying in bed and watching movies. (Tr. 811). In May 2016, she began volunteering for the Jaycees and helped the organization work on a parade float.[5] (Tr. 780, 793, 813, 818). Dr. Gangwani continued reporting that plaintiff was alert and oriented with memory intact, and limited to fair insight and judgment. (Tr. 984-985, 988, 991).

In 2017, plaintiff's mood and behavior continued to be labile, going from depressed to stable to manic. (Tr. 773-752). This continuing sea change was even observed in full by Jackson in the course of one therapy session. (Tr. 752). She further reported that plaintiff was alert and oriented with memory intact, although plaintiff still exhibited impaired insight and judgment. (Tr. 773-752). Dr. Gangwani continued reporting that plaintiff was alert and oriented with memory intact, and limited to fair insight and judgment. (Tr. 959-978).

In January 2018, plaintiff appeared to be stable when seen by Dr. Gangwani, despite family stressors. He observed plaintiff was smiling intermittently with a pleasant affect. Plaintiff stated that she had anxiety about a future disability hearing. Dr. Gangwani additionally reported that plaintiff was alert and oriented with memory intact, and limited to fair insight and judgment. (Tr. 955).

### 4. State Agency RFC Assessments

---

[5] The United States Junior Chamber, also know as the Jaycees, is a not-for-profit youth civic organization. http://jciusa.org (last visited on June 20, 2019).

In November 2015, acting as a state agency consultant, Howard Tin, Psy.D., assessed plaintiff's mental RFC based on a review of the file materials. Dr. Tin found that plaintiff had no difficulties in maintaining concentration, persistence, or pace; remarking that "[c]laimant's allegation of the severity of the disorder is not consistent with claimant's ability to function generally well from day to day." (Tr. 168). In April 2016, acting as a state agency consultant, Larry Kravitz, Psy.D., assessed plaintiff's mental RFC based on a review of the file materials. Dr. Kravitz found that plaintiff had mild difficulties in maintaining concentration, persistence, or pace; stating that plaintiff's "[m]ental conditon (sic) appears relatively under control with treatment. No more than mild limitations are supported secondary to mental factors." (Tr. 198-199).

## Analysis

Plaintiff's first argument centers on the accusation that the ALJ failed to account for her moderate deficit in concentration in his RFC finding. The ALJ's RFC assessment and the hypothetical question posed to the VE must both incorporate all of the limitations that are supported by the record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). This is a well-established rule. See, *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009)(collecting cases). If the ALJ finds that a plaintiff has a moderate limitation in maintaining concentration, persistence or pace, that limitation must be accounted for in the hypothetical question posed to the VE; in most cases, limiting the plaintiff to simple, repetitive tasks or to unskilled work is not sufficient to account for moderate concentration difficulties. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010).

Here, the ALJ gave little weight to the assessment of the state agency consultant psychologists. (Tr. 29). The ALJ found that plaintiff had moderate difficulties in maintaining concentration and mild difficulties in maintaining persistence or pace at step three of the sequential analysis when determining whether plaintiff's mental impairments meet or equal a listed impairment. He noted that, while the step three determination is not a mental RFC assessment, the ultimate RFC assessment "reflects the degree of limitation I have found in the "paragraph B" mental functional analysis." (Tr. 21-22).

Plaintiff finds two cases instructive based on the facts of the case at hand. In *Winsted v. Berryhill*, 915 F.3d 466, 471 (7th Cir. 2019), the Court stated, "[a]gain and again, we have said that when an ALJ finds there are documented limitations of concentration, persistence, and pace, the hypothetical question presented to the VE must account for these limitations. [Citations omitted.] We have also made clear that in most cases 'employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace, and thus, alone, are insufficient to present the claimant's limitations in this area." *Ibid.* at 471. At step three, the ALJ in *Winsted* found that the plaintiff had moderate difficulty with social functioning and concentration, persistence, and pace. The RFC assessment limited plaintiff to "simple, routine, repetitive tasks with few workplace changes, no team work, and no interaction with the public." *Ibid.* at 470. The Court held that the hypothetical question based on that RFC assessment was erroneous because it "did not direct the expert to consider problems with concentration, persistence, and pace,

which is the hypothetical the ALJ relied on for the RFC. Though particular words need not be incanted, we cannot look at the *absence* of the phrase 'moderate difficulties with concentration, persistence, and pace' and feel confident this limitation was properly incorporated in the RFC and in the hypothetical question." *Ibid.* at 471 (emphasis in original).

In *DeCamp v. Berryhill*, 916 F.3d 671 (7th Cir. 2019), state agency reviewers found that the plaintiff had moderate limitations in maintaining concentration, persistence, or pace; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. At step three, the ALJ found that the plaintiff had moderate limitations in concentration, persistence, or pace. The ALJ limited the plaintiff to "unskilled work with an SVP of 2 or less, with no fast-paced production line or tandem tasks, at a job that allows her to be off task up to 10% of the workday." *Ibid.* at 674-75.

The Seventh Circuit held:

> We agree that the ALJ erred by not including DeCamp's "moderate" limitations in concentration, persistence, and pace in the hypothetical question to the vocational expert. The ALJ's hypothetical to the vocational expert omitted any mention of DeCamp's moderate limitations in the four areas identified by [state agency examiner] Dr. Pape (whose opinion the ALJ cited to support her finding): maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination or proximity to others without being distracted; and completing a normal workday and workweek without interruptions from psychologically based symptoms

> and performing at a consistent pace. The ALJ opted instead to limit DeCamp to "unskilled work" with no "fast-paced production line or tandem tasks." We have previously rejected similar formulations of a claimant's limitations because there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace.

*Ibid.* at 675-76.

Here, the ALJ's findings differ from the errors found in these cases. For starters, the ALJ went outside of the bounds of the findings of the state agency reviewers, who rated plaintiff as having no difficulties and mild difficulties in maintaining concentration, persistence, or pace. Giving the consultants little weight in their assessments, the ALJ found that plaintiff had moderate difficulties maintaining concentration and mild limitations in persistence or pace. The ALJ also added mental limitations of only occasional decision-making or changes in the work setting; no interactions with the public; and only brief interaction with co-workers. All these limitations were posed in the hypothetical question to the VE. Furthermore, a moderate rating means that plaintiff can "fairly" maintain concentration independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. Pt. 404, Subpt. B, App. 1, § 12.00(F). No inherent discrepancy exists between a moderate rating and the ALJ's conclusion in his RFC.

Next, plaintiff argues that the ALJ equated her minimal activity with capacity to perform substantial gainful activity. Although that argument does not work on its own here, implicit in this argument is the implication that the ALJ misstated facts, or at least misplaced emphasis on facts in way that borders on cherry-picking. In assessing a plaintiff's RFC, and logically, plaintiff's capacity to perform substantial

gainful activity, an ALJ must consider all relevant evidence in the case record and evaluate the record fairly. *Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir. 2003); 20 C.F.R. § 404.1545 (a)(1) and (3). While the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to his findings. *Ibid.* (citing *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001) and *Zurawski,* 245 F.3d at 888). Otherwise, it is impossible for a reviewing court to make an informed review. *Golembiewski,* 322 F.3d at 917 (citing *Smith v. Apfel,* 231 F.3d 433, 438 (7th Cir. 2000)).

Here, the ALJ committed a fatal error. In his decision, when referring to symptoms of plaintiff's BD, the ALJ stated that "[t]here is little evidence of manic-type symptoms until August 27, 2015 when the claimant presented to Ms. Jackson with increased energy, talking, and laughing, but notably, she discussed looking for employment with some flexibility requiring lifting requirements, and possibly taking classes at community college." However, long before August 2015, plaintiff and Jackson both commented on plaintiff's manic symptoms. In February 2014, Jackson observed that plaintiff was possibly manic with disconnected affect, often laughing and smiling when discussing frustrations and stressors. (Tr. 571). Later, in January 2015, plaintiff herself reported that she had "been sort of manic lately." (Tr. 519). In the same month, Jackson noted plaintiff exhibited flight of ideas regarding her thought processes, which is commonly associated with mania in people that suffer from BD. (Tr. 517). The lack of evidentiary support in this case requires remand. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue,* 697 F.3d 642,

646 (7th Cir. 2012) (internal citation omitted).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period, or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   June 24, 2019.**

DONALD G. WILKERSON
UNITED STATES MAGISTRATE JUDGE